**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 21-30055 |
| *Plaintiff-Appellee,* | D.C. No. 2:19-cr-00111-WFN-17 |
| v. | |
| GERARDO FARIAS-CONTRERAS, AKA Tomas Gomez, | OPINION |
| *Defendant-Appellant.* | |

Appeal from the United States District Court
for the Eastern District of Washington
Wm. Fremming Nielsen, District Judge, Presiding

Argued and Submitted May 18, 2022
Seattle, Washington

Filed February 15, 2023

Before: Kim McLane Wardlaw, Ronald M. Gould, and
Mark J. Bennett, Circuit Judges.

Opinion by Judge Wardlaw;
Dissent by Judge Bennett

## SUMMARY[*]

### Criminal Law

The panel vacated a sentence and remanded for resentencing before a different judge in a case in which the defendant contended that the government failed to meaningfully abide by its promise in the plea agreement not to recommend a sentence in excess of the low-end of the guidelines range.

The panel held that the government implicitly breached the plea agreement, a breach that amounted to plain error. The panel wrote that, at sentencing, the government never once stated affirmatively that it recommended a 151-month sentence or a sentence at the low-end of the calculated guidelines range. Far from presenting a "united front" to the judge that would have given the defendant the benefit of his bargain, government counsel informed the judge about splintered considerations within the U.S. Attorney's Office. Moreover, government counsel dwelled on information—including the defendant's prior criminal contacts—already before the district court, making an argument concerning the defendant's drug dealing "lifestyle" that was inflammatory and could serve no other purpose but to influence the court to give a higher sentence. The panel rejected the government's contention that references to damage and danger to society, the community and its families, the defendant's prior criminal contacts, his high level of culpability, citation to a 30-year-

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

old decision approving life without parole for a minor drug transaction, introduction of the dissension in the U.S. Attorney's Office over the low-end sentence, or its emphasis on the distribution of "massive, massive drug quantities over multiple, multiple years" were made to *support* the low-end guideline sentence for which the government promised to advocate.

Given that the prosecution's inflammatory arguments became the court's stated reasons for the sentence imposed, the panel held that there is a reasonable probability that the sentence was influenced by those arguments, and the defendant's substantial rights were thus affected. Given that the government did not strictly comply with its obligation not to recommend a sentence in excess of the low-end of the guideline range, the panel concluded that this implicit breach amounted to a serious violation of the integrity of the plea bargain process and the judicial system.

Dissenting, Judge Bennett wrote that the defendant cannot establish any error, much less plain error. He wrote that the government exceeded its obligation by affirmatively recommending a low-end guideline sentence several times. It also introduced supplemental facts, which the agreement expressly allowed it to do. But even if the government somehow implicitly breached the plea agreement by providing accurate supplemental facts, any breach was not obvious under this court's precedent. Judge Bennett wrote that the record also fails to show a reasonable probability that any implicit breach affected the sentencing. Judge Bennett wrote that on a more practical level, the majority's precedential decision, unless rejected en banc or by the Supreme Court, will materially and unnecessarily harm future defendants in plea negotiations.

4    UNITED STATES V. FARIAS-CONTRERAS

## COUNSEL

Stephen R. Hormel (argued), Hormel Law Office LLC, Spokane Valley, Washington, for Defendant-Appellant.

Caitlin A. Baunsgard (argued) and Brian M. Donovan, Assistant United States Attorneys; James A. Goeke; Vanessa R. Waldref, United States Attorney; Department of Justice United States Attorney's Office, Spokane, Washington; for Plaintiff-Appellee.

## OPINION

WARDLAW, Circuit Judge:

Gerardo Farias-Contreras appeals his 188-month sentence imposed after he pleaded guilty to a one-count indictment for violation of 21 U.S.C. §§ 841 and 846 pursuant to a plea agreement. He contends that the U.S. Attorney implicitly breached the plea agreement by providing the court, both in its sentencing memorandum and its argument at sentencing, with inflammatory argument and information not relevant to the sentencing determination that could have had but one effect—to increase his sentence beyond the low-end of the U.S. Sentencing Guidelines range. Farias-Contreras argues that, by doing so, the government failed to meaningfully abide by its promise in the plea agreement not to recommend a sentence in excess of the low-end of the guidelines range. We agree. The government's arguments implicitly breached the plea agreement, and amounted to plain error that affected Farias-Contreras's substantial rights and undermined the integrity

of the judiciary. We therefore vacate Farias-Contreras's sentence and remand for resentencing before a different judge.

## I.

In a superseding indictment dated November 5, 2019, the United States charged Gerardo Farias-Contreras with conspiracy to distribute 500 grams or more of methamphetamine or heroin in violation of 21 U.S.C. §§ 841 and 846 (Count One), and with possession with the intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (Count Eighteen).

### A.    The Plea Agreement

On October 28, 2020, the parties entered into a plea agreement in which Farias-Contreras agreed to plead guilty to Count One of the superseding indictment, and the government agreed to dismiss Count Eighteen. In the "Statement of Facts," the parties agreed to facts constituting an "adequate factual basis" for the plea. However, the "statement of facts [did] not preclude either party from presenting and arguing, for sentencing purposes, additional facts which are relevant to the guideline computation or sentencing, unless otherwise prohibited in this Plea Agreement."

In exchange for Farias-Contreras's waiver of his constitutional rights attendant to a jury trial, the government agreed not to file any new charges based on facts then known, to dismiss Count Eighteen from the indictment, and to dismiss a second indictment charging illegal reentry in violation of 8 U.S.C. § 1326. The parties made other agreements related to sentencing, including as to specific offense characteristics, role adjustment, acceptance of

responsibility, and criminal history. Most importantly to Farias-Contreras, as to the length of incarceration, the "United States agree[d] not to recommend a sentence in excess of the low-end of the guideline range, as calculated by the United States." The government also agreed that Farias-Contreras was permitted to "recommend any legal sentence."

Farias-Contreras pleaded guilty pursuant to this plea agreement the same day. The district court accepted the guilty plea and ordered a presentence report (PSR) prepared. Ultimately, after reduction of the offense level, the government calculated the adjusted advisory guideline range for Farias-Contreras's term of incarceration as 151–188 months.

B.     The Government's Sentencing Memorandum

In its sentencing memorandum, the government recommended a 151-month term of incarceration and indicated that such a sentence would satisfy 18 U.S.C. § 3553(a). It did so in two sentences of its six-page memorandum. The remainder of the memorandum focused on the social, communal and familial impact of drug trafficking generally, Farias-Contreras's prior contacts with law enforcement, and information already contained in the PSR. The government's memorandum argued:

> Drug trafficking is nothing less than pumping pure poison into our community. The effects of drug trafficking are massive, and in some respects, incalculable, especially when all the collateral consequences are considered. The damage the drugs this Defendant were [sic] peddling cause irreparable harm to the

> community in general as well as to families
> whose members are addicted to controlled
> substances.

The government included nationwide statistics on drug-related deaths, writing "[a]ccording to the Center for Disease Control, in 2018 in the United States, 67,367 individuals died from a drug overdose. In 2019, drug overdose deaths climbed to a record high – with a reported 70,980 deaths." And it emphasized that drug-related deaths were a problem "in this community."

The government then elaborated on the harm suffered by families of drug addicts, noting, "[a]s aptly recorded by Sam Quinones in the book 'Dreamland' about the families of living drug addicts:

> I met with other parents whose children were
> still alive, but who had shape-shifted into
> lying, thieving slaves to an unseen molecule.
> These parents feared each night the call that
> their child was dead in a McDonald's
> bathroom. They went broke paying for
> rehab, and collect calls from jail. They
> moved to where no one knew their shame.
> They prayed that the child they'd known
> would reemerge.

The government then discussed punishment, citing a decades-old out-of-circuit decision that invoked the then-developing Supreme Court Eighth Amendment disproportionality jurisprudence. *Terrebonne v. Butler*, 820 F.2d 156, 157 (5th Cir. 1987), *cert. denied*, 489 U.S. 1020 (1989). In *Terrebonne*, the Fifth Circuit upheld a life

sentence without parole imposed on a small-time drug dealer, concluding that the sentence was not disproportionate to his crime and thus was not cruel and unusual punishment. *Terrebonne*, 820 F.2d at 158. The government quoted extensively from the Fifth Circuit's rationale, including these excerpts:

> "Measured thus by the harm it inflicts upon the addict, and through him, upon society as a whole, drug dealing in its present epidemic proportions is a grave offense of high rank."
> [ . . . ] The Circuit Court continued:

>> Except in rare cases, the murderer's red hand falls on one victim only, however grim the blow; but the foul hand of the drug dealer blights life after life and, like the vampire of fable, creates others in its owner's evil image – others who create others still, across our land and down our generations, sparing not even the unborn.

> *Terrebonne*, 820 F.2d at 157-58.

The government concluded by arguing that "[w]hile this opinion was authored over 30 years ago, it continues to ring true today."

The government next contended that Farias-Contreras was at "the top of criminal culpability in this case," pointing to information already before the district court in the PSR, and characterizing Farias-Contreras's offense conduct as a "dedicated lifestyle."

The government then described a prior interaction Farias-Contreras had with federal agents in 2016, also included in the PSR, where the agents *failed* to locate evidence of controlled substances that two confidential informants had said would be at Farias-Contreras's residence. The government argued that this interaction "did not dissuade or deter the Defendant," writing, "[a]s the evidence in this case shows, the Defendant continued on his illicit endeavor, returning to supplying others with poison."

The government continued, "The Defendant's involvement in drug trafficking appears to stem back the [sic] 1990, as evidenced by his criminal history." A cooperating defendant "places the Defendant's role as a source of supply of multiple pounds of controlled substances dating back to 2008."

The government concluded its argument as to the gravity of Farias-Contreras's role in the offense with the following assertion: "When you contemplate that amount of drugs, over that extended period of time, the effects of his own personal conduct, on society, on communities, on families, are astronomical."

The government next argued that Farias-Contreras's "significant physical limitations"[1] were "evidenc[e of] his dedication to this lifestyle," because he "has not let his physical impairment stop him from engaging in this conduct." The government explained: "He personally

---

[1] Farias-Contreras was shot multiple times in 2004, resulting in eighteen surgeries to repair damage from the bullets. As a result of the shooting, Farias-Contreras was suffering from a number of ailments including: "a broken spine which causes him to walk with braces and a walker; he has problems with his intestines; he manually extracts his feces; and he utilizes a catheter to urinate."

directed and organized others to engage in this illicit conduct
as well as himself, personally, travel to/from California to
collect drug proceeds as well as recruit new customers and
couriers."

The government's argument culminated with its
assertion that "[n]othing this Defendant has encountered in
his life thus far has changed his course. He continues to
choose to engage in significant drug trafficking. A
significant sentence is warrant [sic] to protect the community
from his continued illicit activities. The Defendant and
others must be deterred."

### C.     The Sentencing Hearing

At the sentencing hearing, the government reiterated
many of these arguments. Defense counsel first offered
Farias-Contreras's physical impairments as a reason that the
court should impose a sentence below the low-end of the
guidelines, arguing:

> This is—this is a man, Judge, who was shot
> in the chest and in the stomach. And he still
> has the colostomy. He still has to have a
> urethra. He still has to use manual methods
> in order to relieve himself. He can't walk.
> Yesterday, we had a problem with the braces
> being in shoes.

Defense counsel argued that given Farias-Contreras's
physical condition, his time of incarceration should be
decreased because:

> Our government has said that for every year
> of life, there's two years that are taken off his
> life in longevity while he's in prison, and

that's going to be happening. Prison for him is two times. It's twice as hard as it is for anybody else, and he's going to be punished. He's going to be punished for that.

[…]

When he was 35 years old, he was shot. I think it was three times in the chest and the back, severed L – L-2 and L-3. He's paralyzed. He's had 18 surgeries.

Yesterday, he – he can't walk without the braces that are in his shoes. When he was transferred yesterday – just to give you an example as far as mobility, when he was brought back from Ellensburg, the jail wouldn't let him have his shoes but they let him have his braces, but he can't – the shoes form the basis for the braces so he couldn't walk, just not his shoes. So his physical condition is – is serious and is debilitating and makes him susceptible to conditions while in prison . . .

Based on his physical condition and the difficulties Farias-Contreras would face in prison, defense counsel asked for a 108–121 month term of incarceration.

When asked to respond, government counsel stated, "we're standing by the recommendation that we have in our sentencing memo, and as I hope came through in [our] sentencing memo, the number of which that we're recommending was something that was of much

discussion."[2]   The district court cut in, asking "Much discussion where?" Government counsel responded:

> In our office—of what do we do with this particular defendant? He is at the top of the food chain in terms of criminal culpability, in terms of personally directing and organizing the distribution of a massive, massive amount of drugs . . . [W]e have this individual, multiple years, multiple pounds, a massive amount of drugs that he is responsible for.

Government counsel again returned to the dissension within the U.S. Attorney's Office as to the appropriate term of incarceration: "But we kept coming back in our discussions – everyone was very sympathetic to the physical condition and what that means for him, but we were unanimous in coming back to this physical condition has not deterred his conduct whatsoever." Government counsel told the district court that Farias-Contreras "continued to be a leader/organizer, and there's nothing that will prevent him in the future to returning to that – that role." She again reiterated information already before the court from the PSR:

> I think he's not a person who was a user of controlled substance and then, you know, as

---

[2] Contrary to the dissent's suggestion, Diss. Op. 36 n.3, it was plainly the U.S. Attorney who introduced the irrelevant fact that there had been "much discussion" about the recommended sentence, which naturally prompted the court's question, "Much discussion where?" The U.S. Attorney could have answered the court's question with the words "in our office," but instead chose to elaborate on the substance of the discussion within the U.S. Attorney's Office.

> we frequently see, using snowballs into, you
> know, little distributor, then bigger
> distributor. That's not how he presents. I
> think it's safe to conclude that it's more of a
> lifestyle. It's something that is his primary
> occupation, his profession. He's been a
> source of supply for years, and he's actively
> recruiting others, both as customers and
> couriers, as outlined in the PSIR.

Government counsel summed up the Office's discussions: "[E]veryone was unanimous in that a long period of incarceration is going to be necessary to protect the public from the defendant, to protect society." She again referenced the recommendation made in the government's sentencing memorandum, but never expressly stated that the government recommended the low-end of the guidelines or a 151-month sentence.

After Farias-Contreras's allocution, the district court began explaining the basis for the sentence about to be pronounced, mentioning Farias-Contreras's physical impairments and another mitigating factor. However, the court then stated, "I am concerned about protection of the public . . . it's fair to say that your entire adult life, apparently, has been dedicated to dealing drugs, and that's a serious concern for the protection of the public. . . . [T]here's been no respect for the law on your part."

The court observed that government counsel "in her brief and in her oral presentation, indicated that you were top in the chain, which indicates that you were way up in the distribution." The district court then pointed to certain paragraphs of the PSR that supported the government's

characterization of Farias-Contreras.   The district court
summed up by echoing the government's arguments:

> So we have a big drug organization operating
> in the central part of our state. I think there
> are 18 or 19 defendants listed in this case
> being a member of that conspiracy.   The
> activities are clear, and you were one of the
> top – top dogs in that conspiracy, and the
> damage that can be done and was done to the
> citizens of our community by making
> available those drugs in our area can't be
> quantified. It's impossible to tell.
>
> Lives are lost. Lives are ruined. Families
> broken up, jobs lost, health deteriorated.
> Children become – it becomes available for
> children. Addicts are fed. So it's serious,
> very serious.

The court then imposed a sentence of 188 months,
concluding that the high-end of the guidelines was justified
for the reasons stated: "a huge organization over a long
period of time, you were one of the top dogs in it, and so the
188 months, I think, is a fairly low sentence."

## II.

A defendant's claim that the government breached its
plea agreement is generally reviewed de novo. *United States
v. Mondragon*, 228 F.3d 978, 980 (9th Cir. 2000).   In this
case, however, defense counsel did not object to the
government's statements at sentencing.   Because Farias-
Contreras forfeited his claim of prosecutorial breach by
failing to timely object, we must review that claim for plain

error. *See United States v. Whitney*, 673 F.3d 965, 970 (9th Cir. 2012). Under plain error review, we may grant relief only "if there has been (1) error; (2) that was plain; (3) that affected substantial rights; and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id*. (citation omitted).

## III.

### A.

Farias-Contreras contends that the government implicitly breached its promise "to not recommend a prison sentence in excess of the low-end of the sentencing guideline range," as calculated by the United States. He argues that although the government stated once in its sentencing memorandum that it recommended a 151-month sentence and said twice during sentencing that it was standing by the recommendation made in its sentencing memorandum, the arguments made in both the sentencing memorandum and at the sentencing hearing undercut those representations and could only be understood to militate toward a much longer term of incarceration. We agree.

The law governing the plea-bargaining process has long been well-settled. Deemed both essential to and highly desirable for the criminal justice system, plea-bargaining resulting in the court's acceptance of a guilty plea "must be attended by safeguards to insure the defendant what is reasonably due in the circumstances." *Santobello v. New York*, 404 U.S. 257, 262 (1971). And though the circumstances may vary, the Supreme Court has held that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id*.

It is also well-settled that plea agreements are contracts between the government and the defendant, and "are measured by contract law standards." *United States v. Franco-Lopez,* 312 F.3d 984, 989 (9th Cir. 2002) (citation omitted). We enforce such contracts by their literal terms but construe any ambiguities in favor of the defendant. *See id.*; *see also United States v. Johnson*, 187 F.3d 1129, 1134 (9th Cir. 1999) ("Plea agreements are contracts, and the government is held to the literal terms of the agreement." (citation omitted)). When we interpret the agreement and craft remedies for any breach, we must "secure the benefits promised [to the defendant] by the government in exchange for surrendering his right to trial," *Franco-Lopez*, 312 F.3d at 989, that is, for surrendering his right to require the government to prove guilt beyond a reasonable doubt.

Here, the government agreed "not to recommend a sentence in excess of the low-end of the guideline range, as calculated by the United States." This type of promise can be broken "either explicitly or implicitly." *United States v. Heredia*, 768 F.3d 1220, 1231 (9th Cir. 2014); *see also Whitney*, 673 F.3d at 972 (same). "The government is under no obligation to make an agreed-upon recommendation 'enthusiastically.' However, it may not superficially abide by its promise to recommend a particular sentence while also making statements that serve no practical purpose but to advocate for a harsher one." *Heredia*, 768 F.3d at 1231 (citation omitted). In other words, the government may not purport to make the bargained-for recommendation while "winking at the district court" to impliedly request a different outcome. *United States v. Has No Horses*, 261 F.3d 744, 750 (8th Cir. 2001) (internal quotation marks omitted).

The government implicitly breaches an agreement to recommend a sentence at the low-end of the guideline range

or the functional equivalent—here, not to recommend a sentence in excess of the low-end of the guideline range—if it "then makes inflammatory comments about the defendant's past offenses that do not 'provide the district judge with any new information or correct factual inaccuracies.'" *Heredia*, 768 F.3d at 1231 (quoting *Whitney*, 673 F.3d at 971). "[W]hen the government obligates itself to make a recommendation at the low end of the guidelines range, it may not introduce information that serves no purpose but 'to influence the court to give a higher sentence.'" *Whitney*, 673 F.3d at 971 (quoting *Johnson*, 187 F.3d at 1135). "This prohibition precludes referring to information that the court already has before it, including statements related to the seriousness of the defendant's prior record, statements indicating a preference for a harsher sentence, or the introduction of evidence that is irrelevant to any matter the government is permitted to argue." *Id.* (internal quotation marks and citations omitted). "Such statements are recognized as introduced 'solely for the purpose of influencing the district court to sentence [the defendant] more harshly.'" *Id.* (quoting *Johnson*, 187 F.3d at 1135) (alteration in original).

This type of agreement—that the government will not recommend in excess of the low-end of the guideline range—is of immense importance to the defendant. We have "previously recognized the importance of the government's sentencing recommendation as a bargained-for benefit to the defendant." *Id.* at 973. Indeed, although such a recommendation is not binding on the court, "[w]hat the defendant wants and is entitled to [in entering into a plea agreement] is the added persuasiveness of the government's support regardless of outcome." *United States v. Camarillo-Tello*, 236 F.3d 1024, 1028 (9th Cir. 2001). Where, as here,

the plea agreement allows the defense to argue for a below-guideline sentence, the government's commitment to recommending the low-end guideline sentence operates as a bulwark against imposition of a sentence above that.

### 1. *Error that was plain*

Given the clear, binding, and longstanding precedent governing a prosecutor's promise not to recommend a sentence exceeding the low-end of the guideline range, the government here implicitly breached the plea agreement, a breach that amounted to plain error. The government broke its promise in numerous ways, both in its sentencing memorandum and at sentencing.

At sentencing, the government never once stated affirmatively that it recommended a 151-month sentence or a sentence at the low-end of the calculated guideline range. The government never offered a reason that supported imposition of a sentence at the low-end of the guideline range. To the contrary, government counsel volunteered to the court that Farias-Contreras's sentence was the subject of much discussion in the U.S. Attorney's Office, which she had hoped came through in her sentencing memorandum. This indicated that there was disagreement among the prosecutors within the U.S. Attorney's Office as to whether the low-end guideline sentence was appropriate. Far from presenting a "united front" to the judge that would have given Farias-Contreras the benefit of his bargain, *see Camarillo-Tello*, 236 F.3d at 1028, government counsel informed the judge about the splintered considerations entertained within the U.S. Attorney's Office. Further retreating from the contractually agreed-upon sentence, government counsel told the judge that the one thing the attorneys were unanimous about was "that a long period of

incarceration is going to be necessary to protect the public from the defendant, to protect society." Not once during the sentencing hearing did the government suggest that a low-end guideline sentence would serve that purpose.

Moreover, government counsel dwelled on information already before the district court. For example, paragraphs 195–204 of the PSR described Farias-Contreras's 1998 law enforcement contact involving a failed sale of thirty pounds of methamphetamine. The government next compared Farias-Contreras's conduct with a co-defendant who was involved only for a "year time frame," but had been sentenced to 240 months of imprisonment. The government argued that Farias-Contreras was involved "since 2008 at a pound-level quantity, multiple pound-level quantities," a statement which can only be understood as advocating for a sentence equal to or above the co-defendant's 240-month sentence. The district court in response pointed to the PSR, stating "[w]ell . . . he was willing to distribute 30 pounds way back in 1998." The government seized the opportunity to double down, reemphasizing, "That's very correct, very correct. So we have this individual, multiple years, multiple pounds, a massive amount of drugs that he is responsible for." Government counsel then pivoted to "previous law enforcement interventions" in 2016 that she acknowledged she had already argued in her sentencing memorandum, when drugs were *not* found in Farias-Contreras's residence and he was *not* charged with any drug-related crime. She summarized the PSR, opined that drug dealing was Farias-Contreras's dedicated "lifestyle," and stated "[h]e's been a source of supply for years, and he's actively recruiting others, both as customers and couriers, as outlined in the PSR."

This argument was inflammatory and provided the district court with no information that had not been presented to it in the sentencing memorandum or the PSR. This information, and that set forth in the sentencing memorandum, could serve no other purpose but to "influence the court to give a higher sentence." *Whitney*, 673 F.3d at 971 (citation omitted); *see also Heredia*, 768 F.3d at 1232 (same); *Mondragon*, 228 F.3d at 980 (same).

The dissent makes much of the fact that the government told the court twice that it stood by "the recommendation . . . in [its] sentencing memo" at the sentencing hearing. Diss. Op. 33, 36. But the government used the 151-month figure only once and only in its sentencing memorandum—government counsel never expressly told the court that the government did not oppose the 151-month sentence. And at the sentencing hearing, government counsel only technically complied with the government's obligation not to argue for a sentence in excess of the low-end of the guideline range. "Although the prosecutor uttered the requisite words by [stating she was abiding by the recommendation in the sentencing memorandum], her additional statements constituted an argument for a higher sentence, breached the government's obligation to recommend a low-end Guideline sentence, and likely had an impact on the [high-end Guideline] sentence imposed." *Whitney*, 673 F.3d at 972. Failing to reiterate the 151-month figure, when paired with the government's inflammatory arguments, further contributed to implicit breach of its agreement.

The government and the dissent argue that the information referenced in its sentencing memorandum and at the sentencing hearing were simply facts that supported the 151-month sentence it advocated for. Diss. Op. 36–38. The dissent relies on *United States v. Moschella*, 727 F.3d

888 (9th Cir. 2013), in which our court found no implicit breach of a plea agreement where "arguments were a fair response to Defendant's request for a downward variance from the low-end of the advisory Guidelines range," and "the government's arguments at sentencing were directed to the specific objective identified in and permitted by the plea agreement." *Id.* at 892; Diss. Op. 37 (quoting *Moschella*, 727 F.3d at 892).

We recognize that the plea agreement allowed either party to "present[] and argu[e] . . . additional facts which are relevant to the guideline computation or sentencing, unless otherwise prohibited in this Plea Agreement." Indeed, it is widely accepted that the government commits no breach in "bringing all relevant facts to the attention of the court." 5 Wayne R. LaFave *et al.*, *Criminal Procedure* § 21.2(d) (4th ed. 2015). However, in its sentencing memorandum and at the sentencing hearing, the government did not limit itself to relevant facts. Instead, government counsel introduced unrelated nationwide drug statistics, opinions about the impact of drugs on the local community, and intra-office discussions on the appropriateness of Farias-Contreras's sentence given his high level of culpability. Government counsel even quoted with approval from a decades-old nonbinding Fifth Circuit decision sanctioning a life-without-parole sentence for a minor drug dealer, and from an opinion-laden book on the poisonous evils of drugs. This information extended far beyond the actual criminal conduct Farias-Contreras pleaded guilty to, and thus was not limited to "relevant facts" as the dissent baldly suggests. Diss. Op. 37–38. Nor was it "directed to the specific objective identified in and permitted by the plea agreement." If anything, this case is an example of where "the Government attorney appearing personally in court at the time of the plea

bargain expressed personal reservations [, both hers and that of her office,] about the agreement to which the Government had committed itself." *United States v. Benchimol*, 471 U.S. 453, 456 (1985). And the government provides us with no persuasive reason to believe the aggravating information it provided to the court was in support of a low-end guideline sentence as opposed to a much higher sentence.

The government argues that the information it provided was necessary to counteract Farias-Contreras's request for a below-guideline sentence. But when the government entered into the plea agreement, it knew Farias-Contreras would ask for a below-guideline sentence. Indeed, the plea agreement expressly allowed him to "recommend any legal sentence." Moreover, the mitigating evidence available to defense counsel was limited primarily to Farias-Contreras's physically impaired condition, and the government minimized even that by arguing that his physical impairments did not impede his criminal conduct. We therefore fail to understand why the government needed to introduce extraneous and irrelevant information in response to defense counsel's argument for a below-guideline sentence, or to reemphasize matters of which the court was well aware.

In sum, we must reject the government's contention that references to damage and danger to society, this community and its families, Farias-Contreras's prior criminal contacts (that did not result in any criminal history points), Farias-Contreras's "top of the criminal chain" role, citation to a thirty-year-old decision approving life without parole for a minor drug transaction, introduction of the dissension in the U.S. Attorney's Office over the low-end sentence and the Office's unanimity as to a "long period of incarceration," or its emphasis on Farias-Contreras's distribution of "massive,

massive drug quantities over multiple, multiple years" were made to *support* the low-end guideline sentence for which the government promised to advocate. The government thus implicitly breached its promise to not recommend a sentence in excess of the low-end of the calculated guideline range.

## 2. *Substantial Rights*

Farias-Contreras "must additionally show that the government's conduct affected both his substantial rights and the integrity, fairness or public reputation of the judicial proceedings." *Whitney*, 673 F.3d at 972 (citing *United States v. Cannel*, 517 F.3d 1172, 1176 (9th Cir. 2008)). We must determine whether there is a reasonable probability that the government's breach in implicitly arguing for a higher sentence rather than unequivocally recommending the low-end guideline sentence resulted in the 188-month high-end sentence imposed. We have "previously recognized the importance of the government's sentencing recommendation as a bargained-for benefit to the defendant, and held that the persuasive force behind a sentencing recommendation is enhanced when it is urged by the government in addition to the defense." *Id*. at 973. Here, Farias-Contreras was denied the benefit of the government's agreement not to argue for a sentence above the low-end of the guideline range.

There is a reasonable probability that the government's inflammatory argument affected the sentencing judge's high-end guideline determination. Though it is true that the district court independently reviewed the PSR, the reasons the court gave in disregarding the government's wink and nod toward a low-end sentence were the very arguments government counsel made to ostensibly support its 151-month recommendation.

First, the district court noted its concern for the "protection of the public," and that "it's fair to say that your entire adult life, apparently, has been dedicated to dealing drugs." It was the government that created this characterization, making this "dedicated lifestyle" argument first in its sentencing memorandum, and then again throughout its argument at the sentencing hearing. The district court then explicitly referred to the prosecutor's statements, saying that the prosecutor, "in her brief and in her oral presentation, indicated that you were top in the chain, which indicates that you were way up in the distribution." The court then specifically referenced various paragraphs within the PSR, but returned to the prosecutor's top of the chain argument, as well as the prosecutor's arguments regarding protecting the public, community, and families. The court concluded its reasoning repeating virtually verbatim statements earlier made by the government:

> So we have a big drug organization operating in the central part of our state . . . The activities are clear, and you were one of the top—top dogs in that conspiracy, and the damage that can be done and was done to the citizens of our community by making available those drugs in our area can't be quantified. It's impossible to tell.

Next, adopting the themes emphasized in the government's sentencing memorandum, particularly the excerpts from the novel *Dreamland*, that described the effect of drug trafficking generally, the district court further elaborated on the reason for the sentence it intended to impose:

> Lives are lost.  Lives are ruined.  Families
> broken up, jobs lost, health deteriorated.
> Children become—it becomes available for
> children.  Addicts are fed.  So it's serious,
> very serious.

The court immediately thereafter imposed the 188-month
sentence, reasoning that "the high end is justified for the
reasons that I've stated."  Even if, as the dissent argues, the
district court also considered Farias-Contreras's criminal
history as part of his sentencing, Diss. Op. 39–41, its reliance
on these broader themes makes clear that government
counsel's arguments had an impact on the court's final
determination.

The government analogizes this case to our previous
decision in *United States v. Gonzalez-Aguilar*, 718 F.3d
1185 (9th Cir. 2013).  There, the defendant pleaded guilty to
one count of being a previously deported noncitizen found
in the United States in violation of 8 U.S.C. § 1326.  *Id.* at
1186.  The defendant entered into a plea agreement,
requiring the government to stipulate to recommending a 46-
month sentence (the low-end of the applicable guidelines
range) and to "not seek, argue, or suggest in any way, either
orally or in writing, that any other specific offense
characteristics, adjustments, departures, or variances in
sentence . . . be imposed, or that the Court impose a sentence
other than what has been stipulated to by the parties."  *Id.*
(alteration in original).  There, in its sentencing
memorandum, the government advocated for a 46-month
prison sentence followed by three years of supervised
release, stating that the defendant had fourteen other drug
related criminal offenses and that the defendant "continues
to flout the law and shows no signs of stopping."  *Id.* at

1186–87. Gonzalez-Aguilar ultimately received a 57-month sentence followed by three years of supervised release and appealed, claiming that the government implicitly breached the plea agreement in describing his former convictions and including "inflammatory language." *Id*. at 1187.

Without deciding whether the government's arguments amounted to a breach, we found that Gonzalez-Aguilar's substantial rights were not violated. *Id*. "The record establishe[d] that the district court conducted its own independent evaluation of the propriety of the stipulated sentence." *Id*. In that case, however, the district court recited its *own* independent reasons for imposing a lengthier sentence, namely Gonzalez-Aguilar's other offenses that were laid out in the PSR but not fully addressed by the government's sentencing memorandum. *Id*. at 1187–88. Additionally, Gonzalez-Aguilar was unable to show that the district court would have otherwise been unaware of Gonzalez-Aguilar's criminal history, given that it was already conveyed "in far greater detail" in the PSR. *Id*. at 1188. Thus, Gonzalez-Aguilar's arguments amounted to "only speculation," failing to prove that it was reasonably probable that, absent the government's arguments, the court would have accepted the plea agreement or imposed a more lenient sentence. *Id*. at 1188–89.

Here there is no such speculation. In handing down Farias-Contreras's sentence, the district court reiterated the arguments and themes that the government articulated throughout its sentencing memorandum and its oral argument. Some of this information, including the dissension within the U.S. Attorney's Office over what would have been a more appropriate sentence, would never have been before the district court, but for the government's choice to inform the judge about the internal discussions.

This stands in stark contrast to *Gonzalez-Aguilar* where the PSR included all the court's cited reasons for disregarding the stipulated sentence. And the district court here, instead of engaging in a purely independent evaluation, credited the government's arguments made in both the sentencing memorandum and at the hearing. For example, the court noted that the prosecutor "in her brief and in her oral presentation, indicated that you [referring to Farias-Contreras] were top in the chain, which indicates that you were way up in the distribution." Thus, *Gonzalez-Aguilar* does not control our analysis here.

Given that the prosecution's inflammatory arguments became the court's stated reasons for the sentence imposed, there is a reasonable probability that the sentence was influenced by those arguments. Farias-Contreras's substantial rights were thus affected.

### 3. *Integrity of the Judiciary*

"The integrity of the criminal justice system depends upon the government's strict compliance with the terms of the plea agreements into which it freely enters." *Heredia*, 768 F.3d at 1230; *see also Mondragon*, 228 F.3d at 981 (same). In *Whitney*, we elaborated on why the government's faithful compliance with its contractually-obligated duty is so strictly required:

> A defendant forfeits many of his constitutional rights when he enters into a plea agreement with the government. In addition to sacrificing these rights, he relieves the government of its burden to prove his guilt beyond a reasonable doubt, and eliminates the need for the government to

> expend its limited time and resources on a full
> criminal trial. He does so not out of a
> benevolent concern for the efficient
> allocation of government resources, but in
> order to receive the benefits of the bargain
> into which he has entered. The government's
> inducement of the defendant's plea, and the
> consequent forfeiture of his constitutionally-
> guaranteed rights, requires that "a promise or
> agreement of the prosecutor . . . must be
> fulfilled."

*Whitney*, 673 F.3d at 974 (alteration in original) (quoting
*Santobello*, 404 U.S. at 262). Therefore, unless there are
"clearly countervailing factors, the government's breach of
the parties' plea agreement must be considered a serious
violation of the integrity of the plea bargain process and the
judicial system." *Id*. To determine whether a clearly
countervailing factor exists, we look to situations where "the
defendant himself has engaged in conduct that undermined
the parties' obligations." *Id*.; *see, e.g., Puckett v. United
States*, 556 U.S. 129, 142–43 (2009) (explaining that
expecting the government to advocate for a sentencing
reduction for acceptance of responsibility contained in a plea
agreement would be "ludicrous" when the defendant
continued to engage in criminal activity after signing the
agreement).

Here, no clearly countervailing factors exist. The
government cannot point to a single breach of the plea
agreement on Farias-Contreras's part. Even though defense
counsel argued for a sentence lower than the guideline range
calculated by the government, the plea agreement explicitly
permitted him to do so. Given that the government did not

strictly comply with its obligation "not to recommend a sentence in excess of the low-end of the guideline range," this implicit breach amounted to "a serious violation of the integrity of the plea bargain process and the judicial system." *Whitney*, 673 F.3d at 974.[3]

### B.

The government agrees that if we determine that the prosecutor breached the plea agreement, remand to a different judge for resentencing is required under our precedent. *Id*. at 968 n.1.

### IV.

For the reasons given, we vacate Farias-Contreras's sentence and remand to the district court for the Clerk of the Court to reassign this case for resentencing. We take no position as to the appropriateness of the sentence; we simply conclude there is a reasonable probability that it was the product of the prosecutor's implicit breach of its promise and thus Farias-Contreras was deprived of the benefit of his plea bargain.

**SENTENCE VACATED; REMANDED.**

---

[3] Thus, there is no need for the government to be "upset" with this result, Diss. Op. 41, and there is no reason for the government to take this result out on future defendants—the government need only live up to the long-standing contractual principles governing plea agreements, even if it later develops buyer's remorse because the "low-end of the guideline range" turns out to be lower than expected.

BENNETT, Circuit Judge, dissenting:

I respectfully dissent because Gerardo Farias-Contreras cannot establish any error, much less plain error. The government complied with the terms of the plea agreement. As promised, it did not recommend a sentence above the low-end guideline range. In fact, it exceeded its obligation by affirmatively recommending a low-end guideline sentence several times. It also introduced supplemental facts, which the agreement expressly allowed it to do. Quite simply, the government did not breach the plea agreement. But even if the government somehow implicitly breached the plea agreement by providing accurate supplemental facts, any breach was not obvious under our precedent. The record also fails to show a reasonable probability that any implicit breach affected the sentencing. The district court made clear that it imposed a high-end sentence because Farias-Contreras was a leader of a huge drug-trafficking organization and had trafficked enormous quantities of dangerous drugs for more than two decades. These crucial facts were in the presentence report ("PSR"), and thus there is no reasonable probability that the government's supplemental facts affected the sentencing. Finally, on a more practical level, I believe that the majority's precedential decision, unless rejected en banc or by the Supreme Court, will materially and unnecessarily harm future defendants in plea negotiations.

**I**

Farias-Contreras was charged with conspiracy to distribute 500 grams or more of methamphetamine or heroin, and possession with intent to distribute 500 grams or more of methamphetamine. He entered into a plea agreement with the government in which he pleaded guilty to the conspiracy

charge. The plea agreement contained a lengthy statement of stipulated facts showing that Farias-Contreras had supplied multi-pound quantities of methamphetamine and heroin to many individuals over many years. As just one example, the parties stipulated that a drug runner for Farias-Contreras, on each of multiple occasions, delivered to just one of Farias-Contreras's many customers *five to ten pounds* of methamphetamine and about *two kilograms* of heroin. Farias-Contreras's drug runner received all these drugs directly from Farias-Contreras.

The plea agreement expressly allowed the parties to supplement the facts: "This statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts which are relevant to the guideline computation or sentencing, unless otherwise prohibited in this Plea Agreement." The government agreed "not to recommend a sentence in excess of the low-end of the guideline range, as calculated by the United States." The agreement permitted Farias-Contreras to "recommend any legal sentence."

The PSR calculated a base offense level of 38:

> The guideline for a violation of 21 U.S.C. § 841(a)(1) is USSG §[] 2D1.1. In the plea agreement, the parties stipulated the defendant's relevant conduct involved no less than 90,000 kilograms of converted drug weight resulting in a base offense level of 38 pursuant to USSG §[] 2D1.1(a)(5), (c)(1). The defendant distributed methamphetamine, methamphetamine (actual), and heroin. When an offense involves multiple types of controlled substances, each substance is

> converted to a total converted drug weight to
> determine the base offense level. At least
> 90,000 kilograms or more of converted drug
> weight establishes a base offense level of 38.
> Here, the defendant is responsible for at least
> 186,181.40 kilograms.[1] This calculation
> takes into account the quantities the
> defendant stipulated to in the plea agreement.
> This officer believes the parties [sic]
> stipulation to a base offense level of 38 is
> reasonable.

Based upon a total offense level of 38 and a Criminal History
Category of I, the PSR calculated a guideline imprisonment
range of 235 to 293 months and recommended a sentence
within that range.

Farias-Contreras filed a sentencing memorandum in
which he explained that, under the plea agreement, the
government would likely calculate an advisory guideline
range of 210–262 months. Farias-Contreras argued that the
court should depart significantly downward to a range of
108–135 months for various reasons, including because of
his significant physical medical conditions.

About one week later, the government filed its
sentencing memorandum. It ultimately sought an advisory
guideline range of 151–188 months. As promised, the
government did not recommend a sentence above the low-
end of the guideline range; it affirmatively recommended "a
term of incarceration of 151 months"—the low-end of its
calculated guideline range. The government's memorandum

---

[1] 186,181.40 kilograms equals about 410,000 pounds, more than 200
tons.

argued that despite his physical limitations, Farias-Contreras was at "the top of criminal culpability . . . as a multi-pound-level source of supply to multiple individuals, spanning over the course of multiple years." The memorandum highlighted facts from the PSR that supported its argument. The government's memorandum also included supplemental information about the harm to the community caused by drug trafficking in general.

At sentencing, Farias-Contreras's counsel continued to argue that the court should use an advisory range of 108–121 months—a range well below the government's low-end recommendation of 151 months. The government, consistent with its obligations under the plea agreement, explicitly told the court *two times* during the sentencing hearing that it stood by the recommendation in its memorandum, which was the low-end guideline sentence of 151 months: "we're standing by the recommendation that we have in our sentencing memo," and "we are recommending the term of incarceration that we have outlined in our sentencing memo." The district court determined that the government's recommendation was "too low" and imposed a high-end sentence of 188 months.

The district court imposed a high-end sentence mainly because Farias-Contreras was a leader of a large drug-trafficking organization and had trafficked drugs for a long time. At the outset of sentencing, the court noted its concern that Farias-Contreras's "entire adult life . . . ha[d] been dedicated to dealing drugs" and that he lacked "respect for the law." Then, turning to the PSR, the court stated:

> I went through the presentence report. I spent a lot of time in that presentence report. . . .

> And I'm not going to go through the whole
> thing, but, Mr. Farias-Contreras, your activity
> for many, many years, starting in,
> apparently . . . —that we're aware of that you
> ran afoul of the law was 1998 in California
> where you indicated that you were able to sell
> 30 pounds of methamphetamine, and you got
> two years in jail; so that goes way back.
> Now, I'm just going to make reference to
> some of the paragraphs in the presentence
> report that I think are *significant* because
> they're descriptive of how deeply involved
> you were in this big organization that was
> responsible for distributing in this geographic
> area huge amounts of methamphetamine.

(emphasis added).

The PSR paragraphs discussed by the district court established that Farias-Contreras had distributed large amounts of methamphetamine and heroin to multiple purchasers. He personally transported drugs from California to Washington, collected drug proceeds from customers, and took the proceeds back to California. He also dispatched others to bring drugs to Washington. One of his several couriers transported ten to fifteen pounds of drugs about twenty-four times. He employed another courier who regularly transported twenty to twenty-five pounds of methamphetamine to Washington per trip and returned to California with $30,000 to $40,000 each time. These trips happened every few weeks.

Farias-Contreras had been dealing drugs for a long time. In 1993 he was convicted of criminal conspiracy and

sentenced to four years; he served about five months.[2] In 1998, he was convicted of possession of a controlled substance for sale and sentenced to two years. In connection with that conviction, the PSR noted that Farias-Contreras told a confidential informant that he would sell the informant *thirty pounds* of methamphetamine. In 2008, he was dealing drugs in pound quantities.

The district court concluded sentencing with: "I think the high end is justified for the reasons that I've stated. In brief summary, a huge organization over a long period of time, [Farias-Contreras was] one of the top dogs in it, and so the 188 months, I think, is a fairly low sentence."

At no time prior to or during sentencing, did Farias-Contreras claim that the government had breached the plea agreement or done anything improper. Indeed, Farias-Contreras's counsel told the court at sentencing that the prosecutor had been "straightforward and level and frank."

## II

There is no dispute that our review is for plain error, and that Farias-Contreras bears the burden of satisfying this "difficult" standard. *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). Farias-Contreras must therefore establish that there was error, the error was plain, there is a reasonable probability that the error affected the outcome, and the error seriously affected "the fairness, integrity, or public reputation" of the sentencing proceedings. *Id.* at 2096–97

---

[2] The PSR noted that the original charges were "criminal conspiracy and manufacture/controlled substance."

(quoting *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1905 (2018)).  Farias-Contreras has not satisfied his burden.

There was no error because the government complied with the plea agreement's terms.  The majority incorrectly suggests that the government had an obligation to "expressly t[ell] the court that [it] did not oppose the 151-month sentence." Maj. Op. 20.  The plea agreement contained no such obligation.  Rather, the government agreed "not to recommend a sentence in excess of the low-end of the guideline range, as calculated by the United States."  The government did just that by recommending throughout the sentencing proceedings that the court impose the sentence recommended in its sentencing memorandum, which was the low-end sentence of 151 months.  That the government included additional information to support its recommendation and rebut Farias-Contreras's request for a lower sentence did not cause an implicit breach because the plea agreement *expressly permitted* the parties to supplement the facts for sentencing purposes.  *See United States v. Moschella*, 727 F.3d 888, 892 (9th Cir. 2013) (finding no implicit breach where the plea agreement permitted the parties to supplement the facts).

And the majority is simply wrong that the additional information served no purpose other than to influence the court to impose a higher sentence than the government recommended.[3]　　The additional information served

---

[3] I note that some of the information that the majority takes issue with was provided by the prosecutor in direct response to questions and remarks from the court.  For example, the prosecutor mentioned in passing that there had been "much discussion" about the government's recommended sentence, but the prosecutor elaborated when the court interrupted and asked, "Much discussion where?"

manifestly valid purposes. First, the government had the absolute right to respond to Farias-Contreras's arguments for a much lower sentence than the sentence the government had recommended (a recommendation in absolute accord with the plea agreement). And second, the government had the right—perhaps even the obligation—to try to justify its recommended sentence. Indeed, in a case involving materially similar circumstances, we found no implicit breach.

In *Moschella*, the government promised to recommend a low-end guideline sentence. 727 F.3d at 890. But the agreement also allowed the defendant to argue for a below-guideline sentence, permitted the government to oppose any defense motion for a below-guideline sentence, and permitted either party to supplement the facts with relevant information. *Id.* at 890, 892. The defense argued for a below-guideline sentence, and the government urged the court to reject such argument—highlighting the seriousness of the offense and stating that the defendant had been "motivated by greed, and that he was a danger to society." *Id.* at 891. We held that there was no implicit breach because the government's "arguments were a fair response to Defendant's request for a downward variance from the low-end of the advisory Guidelines range," and "the government's arguments at sentencing were directed to the specific objective identified in and permitted by the plea agreement." *Id.* at 892.

So too here. Farias-Contreras could and did argue for a sentence well below the government's recommendation. And under the plea agreement, the government could and did supplement the facts with relevant information. Nothing in the plea agreement prohibited the government from opposing Farias-Contreras's request for a lower sentence.

So, as in *Moschella*, the government's supplemental information and related arguments were a fair response to Farias-Contreras's request for a much lower sentence, and there was no implicit breach.

The majority finds that the government had no valid reason for providing the supplemental information because the information was "irrelevant." Maj. Op. 22. According to the majority, the plea agreement limited the government to "relevant facts," meaning information related to Farias-Contreras's "actual criminal conduct." Maj. Op. 21. But the plea agreement was not so limited. The agreement allowed either party to present "additional facts which are relevant to . . . sentencing." All the supplemental information provided by the government was relevant to sentencing. *See* 18 U.S.C. § 3553(a). Thus, the government could present the additional information, and it had a valid reason for doing so: to explain why its recommended sentence, and not the much lower sentence recommended by the defendant, was justified under the circumstances.

Even if there was an implicit breach, it was not plain. To be plain, "the legal error must be clear or obvious, rather than subject to reasonable dispute." *Puckett*, 556 U.S. at 135. The majority mostly relies on three cases to find plain error: *United States v. Heredia*, 768 F.3d 1220 (9th Cir. 2014), *United States v. Whitney*, 673 F.3d 965 (9th Cir. 2012), and *United States v. Mondragon*, 228 F.3d 978 (9th Cir. 2000). Maj. Op. 16–20. But all three cases are materially distinguishable because in each case the facts were such that the government's supplemental information and related arguments served *no purpose* other than to argue improperly for a harsher sentence. *See Heredia*, 768 F.3d at 1234; *Whitney*, 673 F.3d at 971; *Mondragon*, 228 F.3d at 980.

Further, even if the three cases could be construed to support an implicit breach, *Moschella*, at the very least, creates a reasonable dispute as to whether the government implicitly breached the plea agreement. As discussed above, in *Moschella* we found no breach under similar circumstances. Farias-Contreras therefore cannot show any implicit breach was plain. *See Puckett*, 556 U.S. at 135.

Farias-Contreras also cannot show that there is "a reasonable probability that the error affected the [sentencing]." *United States v. Marcus*, 560 U.S. 258, 262 (2010). A "possibility" of a different outcome is not enough. *United States v. Gonzalez-Aguilar*, 718 F.3d 1185, 1189 (9th Cir. 2013). The record shows that the district court imposed a high-end sentence because Farias-Contreras was a leader of a large drug organization and had a long drug-trafficking history. Those were the central facts supporting the district court's high-end sentence. Indeed, the district court highlighted those facts at the start:

> I am concerned about protection of the public, and I'll expand on it in a minute why I say that, but it's fair to say that your entire adult life, apparently, has been dedicated to dealing drugs, and that's a serious concern for the protection of the public. I'm also concerned about the lack—there's been no respect for the law on your part.

The district court then elaborated on several paragraphs of the PSR containing the key facts that Farias-Contreras had been a leader and had a long drug-trafficking history: "[T]he evidence . . . makes it clear the distribution that you were involved included large amounts of drugs—

methamphetamine, heroin—and you were distributing it to many purchasers." An informant said "that he traveled for you, 10 to 15 pounds of meth per trip, maybe as many as 24 trips, and you gave him the instructions and the orders." The PSR "talks about the fact you were a supplier to somebody . . . starting way back in 2008. That's . . . a long time ago. You were dealing pound quantities."

The district court summarized the relevant parts of the PSR:

> So we have a big drug organization operating in the central part of our state. I think there are 18 or 19 defendants listed in this case being a member of that conspiracy. The activities are clear, and you were of the top—top dogs in that conspiracy, and the damage that can be done and was done to the citizens of our community by making available those drugs in our area can't be quantified. It's impossible to tell.
>
> Lives are lost. Lives are ruined. Families broken up, jobs lost, health deteriorated. Children become—it becomes available for children. Addicts are fed. So it's serious, very serious.

In closing, the district court reiterated that the facts in the PSR were central to its decision: "In brief summary, a huge organization over a long period of time, [Farias-Contreras was] one of the top dogs in it, and so the 188 months, I think, is a fairly low sentence."

Viewing the record as a whole, the district court was deeply influenced by the facts in the PSR showing that Farias-Contreras had been dealing drugs for over two decades and was a leader of a huge organization that trafficked, at minimum, hundreds of pounds of methamphetamine. Given the record, there is no reasonable probability that the government's (entirely appropriate) supplemental information affected the outcome of the proceedings.

*          *          *

In short, Farias-Contreras fails to show that he is entitled to plain-error relief. The majority errs by holding otherwise. And although the majority's decision helps this defendant, it likely does so at the expense of future defendants. Even though the government recommended a low-end sentence and the plea agreement permitted it to supplement the facts, the majority finds that the government *still* committed an implicit breach. How will the government protect itself in future plea negotiations, when it followed the letter of its agreement? It could refuse to agree to recommend a particular "low-end" sentence. It could load the plea agreement with the most damaging possible facts. It could reserve the right to make any argument at all. None of this would be desirable for defendants.

The government should be understandably upset with this unjust result. The defendant was directly responsible for both ending and ruining many lives. The government agreed to a generous plea bargain. The government did not just adhere to the letter of its bargain—it adhered to the spirit as well. As a result, the government affirmatively recommended a term of 151 months, which was far below the PSR's recommended range of 235 to 293 months. Yet

the majority finds not just that the government breached its agreement, but that the breach was plain.

Reversal under plain error review requires that any error had a "serious effect on the fairness, integrity, or public reputation of judicial proceedings." *Greer*, 141 S. Ct. at 2096–97 (internal quotation marks omitted) (quoting *Rosales-Mireles*, 138 S. Ct. at 1905). Nothing remotely like that occurred here. I respectfully dissent.